936 F.2d 378
 60 USLW 2018, 24 Collier Bankr.Cas.2d 2006,
21 Bankr.Ct.Dec. 1376, Bankr. L. Rep. P 74,034
 In re Bobby N. GRAVEN, Bobby F. Graven, Personal
Representative for the Estate of Millie Ann
Graven, Deceased, Debtors.
Bobby N. GRAVEN, Bobby F. Graven, Personal Representative
for the Estate of Millie Ann Graven, Deceased, Appellants,
v.
Richard V. FINK, Trustee, Appellee.
 No. 90-1682.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 16, 1990.
Decided June 25, 1991.
 
 James R. Doran, Springfield, Mo., for appellants.
 Thomas J. O'Neal, Springfield, Mo., for appellee.
 Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and HARRIS,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Bobby Noah Graven and Bobby F. Graven, personal representative for the estate of Millie Ann Graven, Bobby Noah's deceased wife, appeal from the district court's[1] affirmance of a bankruptcy court order granting the trustee's motion under 11 U.S.C. Sec. 1208(d) (1988) to convert the Gravens' Chapter 12 proceeding to Chapter 7, based on a finding of fraud, despite the Gravens' motion to dismiss the case under 11 U.S.C. Sec. 1208(b) (1988). On appeal the Gravens[2] argue that: 1) 11 U.S.C. Sec. 1208(b) creates a right to immediate dismissal of Chapter 12 proceedings upon motion by the debtor; 2) the involuntary conversion to Chapter 7 was improper; 3) the bankruptcy court improperly based its determination of fraud upon the trustee's reports rather than on evidence submitted to that court; and 4) the bankruptcy court failed to make the specific findings necessary to support its ultimate finding of fraud. We are thus presented with an issue of first impression, which is whether under 11 U.S.C. Sec. 1208(d), a court may involuntarily convert a Chapter 12 case to Chapter 7 despite the debtor's request for voluntary dismissal under 11 U.S.C. Sec. 1208(b). We affirm the district court's judgment affirming the bankruptcy court's order to convert the proceedings to Chapter 7.
 
 
 2
 Before seeking Chapter 12 protection, Bobby N. and Millie Graven had transferred extensive holdings in real and personal property to a family-controlled corporation. Bobby N. later transferred the corporation's stock to a family trust. In September 1984, prior to these transfers, the Gravens had claimed a net worth of approximately $1.5 million in a financial statement filed with a bank. In addition to extensive assets in real estate and farm equipment, the Gravens had also accumulated significant debts. When they filed under Chapter 12 in November 1987, they stated that they owed $225,935.84 to unsecured creditors; most of this debt was incurred between 1980 and 1985. In January 1985, the Pillsbury Company obtained a judgment against the Gravens, increasing their debt by $14,871.44.
 
 
 3
 In that same month, January 1985, Bobby N. Graven incorporated the Graven Auction Co., Inc. He was its president, its sole shareholder, and one of its two directors.[3] On January 16, 1985, the same date that the State of Missouri issued a certificate of incorporation to Graven Auction, Bobby N. executed a series of deeds conveying his interest in several tracts of real estate to Graven Auction. These conveyances were recorded within 30 days.[4]
 
 
 4
 In January 1986, Millie Graven executed quit claim deeds purporting to convey her interest in the same tracts.[5] Some of these deeds were recorded in February 1986, but others were not recorded until February 1987. Graven Auction paid no monetary consideration to either of the Gravens for the real estate, despite the fact that in January 1985, the Gravens owed approximately $500,000 to creditors.
 
 
 5
 In January 1986, Bobby N. Graven executed a quit claim deed transferring another tract of real estate to Graven Auction. That same month, Bobby N. and Millie Graven executed a bill of sale conveying all of their livestock (including 169 head of dairy cattle) and farm equipment except for a feed mill to Graven Auction. Graven Auction paid no consideration for this property, and it later leased the livestock and equipment back to Bobby N. Graven at favorable rates that were later reduced. Bobby N. acted as both the lessee and as president of the lessor corporation. The bankruptcy court found that between January 1986 and March 1988, the debtors were in full control and possession of the property. In re Graven, 101 B.R. at 110. During a Rule 2004 examination in December 1988, Bobby N. Graven stated that the lease with Graven Auction had been terminated the month before. The termination was without the permission of the bankruptcy court, and the location of the property is now unclear.
 
 
 6
 Also in January 1986, Bobby N. Graven transferred for no consideration all outstanding shares of stock in Graven Auction, and all but three of the 285 shares of stock in Graven Realty, another corporation that he controlled, to an irrevocable family trust. He retained the voting rights to the stock during his lifetime. The trust document named one of the Gravens' sons, Bobby F. Graven, as trustee, and named all three Graven children, Bobby F., Daniell N. and Gayla A. Graven, as beneficiaries.
 
 
 7
 On November 15, 1986, Bobby N. and Millie Graven executed a quit claim deed, which was recorded four days later, conveying their interest in another tract of land to Graven Auction. Several days earlier, on November 10, Bobby N. Graven had executed a quit claim deed conveying to Graven Auction his interest in the surface estate of a tract in LeFlore County, Oklahoma. That deed was not recorded until November 10, 1987. Two days later, on November 12, 1987, Bobby N. and Millie Graven filed their Chapter 12 bankruptcy petition. On November 17, 1987, five days after the Chapter 12 filing, Bobby N. Graven executed a quit claim deed conveying to Graven Auction his interest in the mineral rights in the Oklahoma property. That deed was recorded on November 20, 1987.
 
 
 8
 Bobby N. and Millie Graven had operated their farm on property called the "Manes Farm," seven hundred acres in Wright County, Missouri. Millie Graven claimed Manes Farm as her permanent residence, and Bobby N. has also claimed to reside there. Along with their other real estate, the Gravens had conveyed Manes Farm to Graven Auction, with Bobby N. first conveying his interest in various Manes Farm tracts and Millie Graven later purporting to transfer her interest by separate deeds.[6] Graven Auction later conveyed Manes Farm back to Bobby N. Graven through a series of quit claim deeds that bore January 1986 execution dates but were not recorded until November 10, 1987, two days before the bankruptcy filing.
 
 
 9
 Following all of these transfers, the only property owned by Bobby N. and Millie Graven was the Manes Farm and the feed system. In their Chapter 12 filing, the Gravens listed debts of $527,437.72 and assets of $202,514.22.
 
 
 10
 In January 1988, the Gravens filed a plan of reorganization. The Federal Lank Bank of St. Louis, a secured creditor, objected to the plan and, along with another creditor, requested that the bankruptcy court order the trustee to investigate the Gravens' actions. In a February 1988 motion, the Federal Land Bank alleged that the Gravens' transfers to closely-held corporations and the family trust may have been fraudulent and therefore voidable. On March 23, 1988, following an evidentiary hearing earlier that month, the bankruptcy court ordered the trustee to investigate the possibility that the Gravens had committed fraud under the bankruptcy code or Missouri law. In re Graven, 84 B.R. 630, 631-32 (Bankr.W.D.Mo.1988). The trustee submitted a preliminary investigation report on November 18, 1988, and a supplemental preliminary report on January 20, 1989. The first report described in detail the Gravens' transactions and alleged that the debtors had transferred property with the intent to "hinder, delay and defraud" their creditors. The report recommended instituting proceedings to set aside the alleged fraudulent transfers. The second report provided information about more of the Gravens' transactions and sought to set aside those transfers as well.
 
 
 11
 At a January 24, 1989, hearing to consider the trustee's reports, the Gravens moved to dismiss their Chapter 12 proceedings under 11 U.S.C. Sec. 1208(b). The trustee subsequently filed a motion to convert the case to Chapter 7 based on the alleged fraud by the Gravens. Following a hearing on April 10, 1989, the bankruptcy court filed its order which held that the Gravens had engaged in a "clear pattern of deliberate fraud perpetrated with the intent to hinder, delay and defraud [their] creditors...." In re Graven, 101 B.R. at 111. Finding that the Gravens had engaged in both prepetition and postpetition misconduct, the bankruptcy court granted the trustee's motion for conversion under 11 U.S.C. Sec. 1208(d) (1988), which states that the court may dismiss a Chapter 12 case or convert it to Chapter 7 upon a showing that the debtor has committed fraud. Id. at 113.
 
 
 12
 The court further held that its decision rendered the Gravens' motion to dismiss moot. Id. It rejected the Gravens' argument that section 1208(b) mandates immediate dismissal upon request of the debtor. The court held that it may convert a case to Chapter 7 despite the debtor's petition for dismissal if fraud is established and "the public good requires" conversion. Id. at 112-13.
 
 
 13
 Reviewing de novo the bankruptcy court's ultimate finding of fraud, the district court affirmed that finding based on the presence of numerous "badges of fraud." Graven v. Fink, No. 89-3587-CV-S-2, slip op. at 7-10 (W.D.Mo. March 29, 1990). The district court particularly noted the transfers of property for little or no consideration occurring when the Gravens owed approximately $500,000 to creditors, the Gravens' possession and use of the property following the transfers, the misrepresentations in the statements the Gravens submitted to the bankruptcy court, and the transfer of the mineral rights to the Oklahoma property after the filing of the petition. Slip op. at 9-10. The district court then affirmed the bankruptcy court's conversion of the case to Chapter 7. Slip op. at 12-14.
 
 I.
 
 14
 As the fraud finding provided the basis for converting this case to Chapter 7 under 11 U.S.C. Sec. 1208(d), we first discuss the predicate issue of fraud. The Gravens make a generalized attack on the finding of fraud, but do not argue that the finding is clearly erroneous and do not address whether this is the appropriate standard of review. The district court reviewed the fraud finding de novo. Slip op. at 7-10.
 
 
 15
 The clearly erroneous standard of review applies to facts found by a bankruptcy court. See Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir.1987); Martin v. Bank of Germantown, 761 F.2d 1163, 1165 (6th Cir.1985). In a case originating in bankruptcy court, the court of appeals acts as a second court of review, and reviews the bankruptcy court's conclusions under the same standards applied by the district court. Wegner, 821 F.2d at 1320.
 
 
 16
 A finding of fraud under the bankruptcy code is, we believe, a factual matter. See Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 874 (8th Cir.1988) (a finding of intent to defraud under the bankruptcy code may be reversed on appeal only if clearly erroneous); T & B Gen. Contracting, Inc. v. Ballenger Corp., 833 F.2d 1455, 1458-60 (11th Cir.1987). See also First Alabama Bank v. First State Ins. Co., Inc., 899 F.2d 1045, 1057 (11th Cir.1990). While we conclude that the clearly erroneous standard properly applies, we recognize that in certain instances a finding of fraud may involve questions of law that simply are not presented in this case.
 
 
 17
 In attacking the fraud finding, the Gravens first contend that the bankruptcy court improperly considered the trustee's reports as evidence of fraud without testimony to substantiate the reports' conclusions.
 
 
 18
 This argument simply lacks merit. The bankruptcy court issued its order after holding an extensive hearing on April 10, 1989. At that hearing, the court considered 98 exhibits offered by the bankruptcy trustee. The Gravens offered no evidence at the hearing. Among the exhibits admitted by the bankruptcy court were transcripts from the Rule 2004 examinations, all depositions taken in the case, a transcript of the March 2, 1988, confirmation hearing, and certified copies of the many deeds showing real estate conveyances by the Gravens. Although the bankruptcy court's opinion referred to the trustee's reports, the opinion establishes that the court considered testimony at the various hearings and that it also reviewed the schedules and statements of affairs submitted by the Gravens. See 101 B.R. at 110-111. The Gravens' argument that the bankruptcy court improperly based its conclusion on the trustee's reports without independently evaluating the extensive evidence is simply contrary to the record before us.
 
 
 19
 The Gravens next contend that the bankruptcy court's finding of fraud is a "general conclusion" made without reference to a specific statute and not supported by specific findings of fact.
 
 
 20
 The bankruptcy court's opinion recites extensive factual findings supporting its ultimate finding of fraud: 1) the lack of monetary consideration paid by Graven Auction to the Gravens for the transfers of real estate; 2) the leasing of livestock and farm equipment from Graven Auction after transferring this property for no consideration to Graven Auction; 3) the transfer of various deeds of trust, promissory notes and accounts receivable to Graven Auction; 4) the reconveyance of the Manes Farm back to the Gravens just before the Chapter 12 filing; 5) the transfer of Graven Auction stock and Graven Realty stock to the irrevocable family trust and the retention of lifetime voting rights in the corporations' stock by Bobby N. Graven; 6) the testimony by Bobby F. Graven, the stated trustee of the family trust, who said he had done nothing to manage the assets of the trust; 7) false statements in documents submitted to the bankruptcy court in which the Gravens failed to disclose the property leased from Graven Auction and stated that they were not parties to any leases; 8) the transfer of the mineral rights to the Oklahoma property after the bankruptcy filing; 9) the transfers of certain property that were not completed until February 1987, bringing them within the one-year period before the filing of the bankruptcy petition; 10) the apparent receipt by the Gravens of proceeds from the sale of three cows after they had allegedly conveyed the cows to Graven Auction. 101 B.R. at 110-111.
 
 
 21
 We are satisfied that the bankruptcy court thoroughly considered the relevant evidence and issued detailed findings of fact based on that evidence. The Gravens do not attack any of these specific findings as clearly erroneous.
 
 
 22
 The bankruptcy court applied the relevant statutory standard when it found a "clear pattern of deliberate fraud perpetrated with the intent to hinder, delay and defraud the creditors of the debtors." 101 B.R. at 111. The "hinder, delay and defraud" standard is found in both 11 U.S.C. Sec. 548(a) (1988) and Mo.Rev.Stat. Sec. 428.020 (1978).
 
 
 23
 11 U.S.C. Sec. 548(a) gives the trustee the power to avoid a fraudulent conveyance made within the one-year prepetition period if the debtor "made such transfer ... with actual intent to hinder, delay or defraud any entity to which the debtor was or became ... indebted...." (Emphasis added).
 
 
 24
 Under 11 U.S.C. Sec. 544(b) (1988), state law is applicable in federal bankruptcy proceedings.[7] Mo.Rev.Stat. Sec. 428.020 (1986) uses the same standard as 11 U.S.C. Sec. 548(a) and states: "Every conveyance ... made or contrived with the intent to hinder, delay or defraud creditors ... shall be ... as against said creditors ... clearly and utterly void." (Emphasis added).
 
 
 25
 The bankruptcy court did not engage in a detailed discussion of intent, but fraudulent intent may be inferred from the circumstances of the transactions. Allison v. Mildred, 307 S.W.2d 447, 454 (Mo.1957).[8] The bankruptcy court found, and the record establishes, that the Gravens entered into numerous transactions in 1985, 1986, and 1987 that, in essence, divested them of virtually all of their assets while leaving their debts unpaid. See Brown v. Oehler, 192 S.W.2d 515, 517 (Mo.Ct.App.1946). Most of those transfers were made for no consideration, with the initial conveyance to a corporation owned by Bobby N. Graven, and a subsequent conveyance of the corporate stock to an irrevocable family trust. See Vaughn v. Christian, 472 S.W.2d 337, 338 (Mo.1971) (conveyance lacking consideration is presumptively void against existing creditors). Despite the transfer of livestock and farm equipment, the Gravens continued to possess and use this property. Moreover, in papers submitted to the bankruptcy court, the Gravens denied being parties to a lease although Bobby N. Graven was at that time leasing the livestock and farm equipment from Graven Auction. In addition, the record shows that Bobby N. Graven made an unauthorized transfer of real estate after filing under Chapter 12. See 11 U.S.C. Sec. 549(a) (1988).
 
 
 26
 We conclude that the bankruptcy court correctly applied the applicable federal and state law and its finding of fraud is abundantly supported by the record. While the Gravens do not attack the fraud finding as clearly erroneous, we have no hesitation in stating that the bankruptcy court did not clearly err in making this finding. We therefore affirm the district court's order affirming the bankruptcy court's finding of fraud.
 
 II.
 
 27
 We must now determine how the two subsections of 11 U.S.C. Sec. 1208 interact. Section 1208(b) appears to mandate dismissal upon request of the debtor-farmer:[9]
 
 
 28
 On request of the debtor at any time, if the case has not been converted under section 706 or 1112 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.
 
 
 29
 (Emphasis added). Section 1208(d), in contrast, uses permissive terms:
 
 
 30
 On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case.
 
 
 31
 (Emphasis added).
 
 
 32
 The Gravens assert that notwithstanding the conversion power granted the court by section 1208(d), the express language of section 1208(b) mandates immediate dismissal upon the debtor's request. The Gravens further argue that the bankruptcy code, in particular Chapter 12, grants farmers[10] special protections and that allowing involuntary conversion to Chapter 7 despite the debtor's requested dismissal would erode farmers' rights under the code. They finally argue that at the time they moved for dismissal, there was no finding of fraud. A bankruptcy court, they assert, should not be permitted to hold a motion for dismissal in abeyance long enough for an investigation of alleged fraud to be conducted.
 
 
 33
 Both the bankruptcy court and the district court rejected the Gravens' arguments, concluding that the overall purpose of the bankruptcy code is best served by a statutory interpretation that allows the bankruptcy court to convert a case to Chapter 7 if fraud is shown, even though the debtor moved for a dismissal. In re Graven, 101 B.R. at 112-113; Graven, district court slip op. at 11-14. The interpretation of a statute is a question of law for the trial court, subject to de novo review on appeal.
 
 
 34
 The express language of 11 U.S.C. Secs. 1208(b) and (d) indeed raises a potential conflict. When interpreting a statute we look not only to the express language, however, but also to the overall purpose of the act. The Supreme Court has directed that we not "construe statutory phrases in isolation." United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). We must also consider "the design of the statute as a whole and ... its object and policy." Crandon v. United States, 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). See also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve"); Kifer v. Liberty Mut. Ins. Co., 777 F.2d 1325, 1332 (8th Cir.1985) ("[T]o ascertain such legislative intent, we may properly consider not only the language of the statute but also the subject matter, the object to be accomplished, the purpose to be served, the underlying policies, the remedy provided, and the consequences of various interpretations").
 
 
 35
 The purpose of the bankruptcy code is to provide a "fresh start" for insolvent debtors. Grogan v. Garner, --- U.S. ----, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). The opportunity for a "completely unencumbered new beginning," however, is not available to all, but is limited to the " 'honest, but unfortunate debtor.' " Id. 111 S.Ct. at 659 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).
 
 
 36
 The Supreme Court's statements make clear that the purpose of the bankruptcy code is to protect the honest debtor, not to provide a shield for those who exploit the code's protection then seek to escape judicial authority when their fraudulent schemes are exposed. As the district court in this case aptly stated:
 
 
 37
 To adopt the interpretation of Sec. 1208(b) and (d) favored by the debtors ... would lead to endless abuse of the bankruptcy process ... and would clearly thwart the clear purpose of Chapter 12, which is to provide relief for the honest debtor, and the intent of Congress in adopting Sec. 1208(d).
 
 
 38
 Graven, slip op. at 12 (citation omitted).
 
 
 39
 Recognizing an absolute right to dismissal under section 1208(b) would also completely undermine the express authority Congress granted the courts under section 1208(d) and would render that subsection useless. See id. The Gravens argue that Congress, by adopting Chapter 12, intended to afford the farmer special protections. Chapter 12 does indeed reflect Congress' intent to bestow favorable treatment on insolvent farm families. Congress also intended, however, to balance farmers' needs with creditors' rights. The House Conference Report states that Chapter 12 "offers family farmers the important protection from creditors that bankruptcy provides while, at the same time, preventing abuse of the system and ensuring that farm lenders receive a fair repayment." H.R.Conf.Rep. No. 99-958, 99th Cong., 2d Sess. 48, reprinted in 1986 U.S.Code Cong. & Admin.News 5246, 5249 (emphasis added).
 
 
 40
 The legislative history on section 1208 is scant. One statement by Senator Grassley appears in the Congressional Record: "If fraud is found, the case will be dismissed or converted to Chapter 7. This encourages good faith, [sic] and honest dealing by the debtor throughout the case." 132 Cong.Rec. 28,593 (1986).
 
 
 41
 We conclude that the broad purpose of the bankruptcy code, including Chapter 12, is best served by interpreting section 1208(d) to allow a court to convert a case to Chapter 7 upon a showing of fraud even though the debtor has moved for dismissal under subsection (b). Our holding on the interaction of subsections (b) and (d) does not conflict with the express language of subsection (b). Nothing in subsection (b) requires that a court act immediately upon a debtor's request for a voluntary dismissal. See In re Tyndall, 97 B.R. 266, 268 (Bankr.E.D.N.C.1989) (a court may delay action on a section 1208(b) motion while it considers motions by other parties). Once fraud is found, the provisions of section 1208(d) are triggered and the court has the authority, under subsection (d), to dismiss the case or convert it to Chapter 7.
 
 
 42
 Other than the lower courts' decisions in this case, only one reported decision addresses the potential conflict between sections 1208(b) and 1208(d). In Foster v. North Texas Production Credit Association, 121 B.R. 961 (N.D.Tex.1990), the district court issued a brief opinion stating:
 
 
 43
 When the facts show that the debtors have abused the legal process and the bankruptcy process through fraud, the bankruptcy court has the authority to convert a chapter 12 proceeding to a chapter 7 liquidation, even though the debtors have filed a motion to dismiss the chapter 12 proceeding.
 
 
 44
 Id. at 961 (citing In re Graven, 101 B.R. 109 (Bankr.W.D. Mo.1989)).
 
 
 45
 In re Zurface, 95 B.R. 527 (Bankr.S.D.Ohio 1989), while not addressing the debtor's right to a dismissal under section 1208(b), does shed some light on the purpose and proper interpretation of section 1208(d). Similar to the case before us, the debtors in Zurface had transferred most of their assets for inadequate consideration to a family-controlled corporation before filing under Chapter 12. 95 B.R. at 536-38. After finding that the debtors had committed fraud, the bankruptcy court refused confirmation of the debtors' Chapter 12 plan, then converted the case to Chapter 7 pursuant to 11 U.S.C. Sec. 1208(d). Id. at 538-39. The debtors had not filed a motion for dismissal under section 1208(b). The court concluded that "relief under Chapter 12 is available only to the honest debtor who is making a sincere effort to repay creditors." Id.
 
 
 46
 Our holding is thus consistent with the few cases that have construed the meaning and purpose of sections 1208(b) and (d). It also is consistent with the interpretation some bankruptcy courts have accorded 11 U.S.C. Secs. 1307(b) and (c) (1988), the analogous provisions in Chapter 13. In In re Vieweg, 80 B.R. 838 (Bankr.E.D.Mich.1987), the bankruptcy court rejected the argument that section 1307(b) provides an unfettered right to voluntary dismissal. Id. at 843. Upon a showing that the debtor had exploited the bankruptcy laws to his advantage without demonstrating any intent to comply with court orders, to restructure his debt or pay creditors, the court converted the case to Chapter 7 despite the debtor's motion for dismissal. Id. at 843-44. Other bankruptcy courts have also rejected the view that section 1307(b) provides an absolute and immediate right to dismissal. See In re Tatsis, 72 B.R. 908, 910 (Bankr.W.D.N.C.1987); In re Gaudet, 61 B.R. 349, 350 (Bankr.D.R.I.1986); In re Powers, 48 B.R. 120, 121 (Bankr.M.D.La.1985); In re Jacobs, 43 B.R. 971, 975-76 (Bankr.E.D.N.Y.1984); but see In re Gillion, 36 B.R. 901, 905-06 (E.D.Ark.1983) (debtor has an absolute right to a dismissal before conversion); In re Looney, 90 B.R. 217, 218 (Bankr.W.D.Va.1988) (court cannot convert Chapter 13 case to Chapter 7 if the debtor has filed motion for dismissal).
 
 
 47
 Moreover, Bankruptcy Rule 1017(a) expressly provides for notice and a hearing before action on a motion for voluntary dismissal:
 
 
 48
 Except as provided in Secs. 707(b) and 1307(b) of the Code, a petition shall not be dismissed on motion of the petitioner or for want of prosecution or other cause or by consent of the parties prior to a hearing on notice to all creditors as provided in Rule 2002(a)....
 
 
 49
 Rule 1017(a) was last amended in March 1987, five months after Congress enacted Chapter 12. At that time, section 707(b) was added to the "except" clause. The failure of Congress to include section 1208(b) in that same clause indicates that Congress intended for the hearing and notice provisions to apply to creditors of Chapter 12 debtors.
 
 
 50
 Finally, the Gravens disingeniously argue that at the time they filed their motion to dismiss "no allegations of fraudulent conduct were asserted." This statement is simply false. The Gravens requested dismissal at the beginning of the January 24, 1989, hearing scheduled to consider the trustee's reports, which were filed on November 18, 1988, and January 20, 1989. Those reports clearly alleged fraud and recommended that the trustee be authorized to initiate proceedings to set aside certain transfers. Moreover, in its March 23, 1988, order, the bankruptcy court discussed at length evidence presented at a confirmation hearing that examined the Gravens' various conveyances of real and personal property. The order specifically noted the allegations of fraud and concluded: "The Court assumes that it will come as no surprise to anyone who has read this far, that the Court does direct that ... the Chapter 12 Trustee ... conduct an investigation." In re Graven, 84 B.R. at 631.
 
 
 51
 The Gravens filed their motion to dismiss one year and seventy-three days after filing their Chapter 12 petition. Having enjoyed the code's protection for that period of time, they abruptly sought dismissal just as the bankruptcy court prepared to hear the evidence of their wrongdoing. We are convinced that the broad purposes of the bankruptcy code are not served by such cynical manipulation of the bankruptcy process. We therefore hold that once fraud has become an issue in a case, the court may delay action on a section 1208(b) motion for dismissal long enough to allow an investigation of the alleged fraud. If fraud is shown, the court may, under 11 U.S.C. Sec. 1208(d), convert the Chapter 12 case to Chapter 7 despite the debtor's motion to dismiss.
 
 
 52
 For the foregoing reasons, we affirm the order of the district court.
 
 
 
 *
 The HONORABLE OREN HARRIS, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation
 
 
 [1]
 The Honorable William R. Collinson, United States Senior District Judge for the Eastern and Western Districts of Missouri
 
 
 [2]
 Millie Ann Graven died on September 28, 1989. The district court substituted Bobby F. Graven as a party defendant in this action on December 7, 1989
 
 
 [3]
 Joanne Lashua, Bobby N. Graven's secretary, was elected the second director and secretary of the corporation
 
 
 [4]
 The bankruptcy court later valued a portion of the real estate conveyed to Graven Auction (including two tracts conveyed in 1986) at $476,000. In re Graven, 101 B.R. 109, 113 (Bankr.W.D.Mo.1989)
 
 
 [5]
 The record is not clear as to whether the Gravens owned any of the real estate individually or as tenants by the entireties, joint tenants, or tenants in common
 
 
 [6]
 See footnote 5
 
 
 [7]
 Subsection 544(b) grants the trustee the power to avoid certain transfers of the debtor to the extent that a creditor with an allowable claim might avoid them under applicable state or federal law. 4 Collier on Bankruptcy, p 544.03 at 544-15 (L. King ed. 1990). See also Landbank Equity Corp. v. Runnells, 83 B.R. 362, 380 (E.D.Va.1987)
 
 
 [8]
 Allison states that a "strong inference of fraud arises from a concurrence of several badges of fraud; such as: [a] conveyance in anticipation of a suit; a conveyance to near relatives; inadequacy of consideration; unusual clauses in instruments or unusual methods of transacting business; transfer of all or nearly all of a debtor's property; insolvency; retention of possession by the debtor; [and] the failure to produce available explanatory or rebutting evidence ..." 307 S.W.2d at 454. See also Community Federal Sav. & Loan Ass'n v. Boyer, 710 S.W.2d 332, 334 (Mo.Ct.App.1986)
 
 
 [9]
 Chapter 12 of the bankruptcy code applies to family farmers
 
 
 [10]
 There is no dispute that the Gravens are farmers within the meaning of Chapter 12, although the record reflects more sophisticated business transactions than Chapter 12 may have been designed to reach